# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

POWER INTEGRATIONS, INC.,

Plaintiff,

v.

EDISON D. DE LARA, et al.,

Defendants.

Case No. 20-cv-410-MMA (DEB)

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT**

[Doc. No. 79]

In its Second Amended Complaint ("SAC"), Power Integrations, Inc. ("Plaintiff") alleges four causes of action: (1) breach of contract; (2) trade secret misappropriation under 18 U.S.C. § 1836; (3) interference with contractual relations; and (4) unfair competition under the California Business and Professions Code.  *See* Doc. No. 78 ("SAC").[1]  Defendants Edison D. De Lara ("De Lara"), Charles Reyes Evangelista ("Evangelista"), Ian B. Barrameda ("Barrameda"), and Alex F. Mariano II ("Mariano") (collectively, "Defendants") move to dismiss Plaintiff's four causes of action pursuant to

---

[1] All citations to electronically filed documents refer to the pagination assigned by the CM/ECF system.

Federal Rule of Civil Procedure 12(b)(6).  *See* Doc. No. 79.  Plaintiff filed an opposition to Defendants' motion, and Defendants replied.  *See* Doc. Nos. 81, 82.  The Court found the matter suitable for determination on the papers and without oral argument pursuant to Federal Rule of Civil Procedure 78(b) and Civil Local Rule 7.1.d.1.  *See* Doc. No. 83.  For the reasons set forth below, the Court **GRANTS in part and DENIES in part** Defendants' motion to dismiss.

## I. BACKGROUND[2]

Plaintiff's allegations arise out of an employment dispute between Plaintiff, Plaintiff's previous employees, and one of Plaintiff's competitors that allegedly targeted Plaintiff's employees.  *See* SAC ¶¶ 11–27.

**A. Plaintiff and General Background**

Plaintiff, a company based in California, is "the leader in power conversion technology," and "a leading innovator in semiconductor technologies for high-voltage power conversion and a leading supplier of cutting-edge power technologies including high-performance [integrated circuits ('ICs')] used in high-voltage power-conversion systems."  SAC ¶ 11.  Plaintiff "is an intellectual property ('IP') focused power technology company" and has invested heavily in developing intellectual property "for its high-voltage power conversion products."  *Id.* ¶ 12.  In 2015, Plaintiff began expanding "its US-based Applications and Engineering Department ('APPS US') by establishing an applications lab in Manila, Philippines ('APPS Philippines') and staffing it with local engineering talent."  *Id.* ¶ 13.  APPS Philippines initially employed 13 individuals, but "grew to a size of nearly 30 engineers by early 2019."  *Id.*

Plaintiff's applications engineers "design, build, and test power supplies using [Plaintiff's] ICs."  *Id.* ¶ 14.  As part of these efforts, Plaintiff maintained and granted its

---

[2] Because this matter is before the Court on a motion to dismiss, the Court must accept as true the allegations set forth in the complaint.  *See Hosp. Bldg. Co. v. Trs. Of Rex Hosp.*, 425 U.S. 738, 740 (1976).

applications engineers access to a secured drive that contained various manuals, specifications, and reports.  *See id.*  Plaintiff further required its applications engineers to maintain personal folders on the secured drive, which Plaintiff retained ownership of, where they were "asked to save all their weekly reports, technical reports, component specifications, reference designs, and other status updates concerning their projects."  *Id.* ¶ 15.  Additionally, Plaintiff required its engineers to maintain confidentiality, and included such requirements in their employment agreements.  *See id.* ¶ 17.

Silanna Semiconductor North America, Inc. ("Silanna") is a competitor of Plaintiff and "is a newcomer in the industry and only recently entered the market for power products including power converter ICs for AC-DC . . . power supplies." *Id.* ¶¶ 2, 18. Penbrothers International Inc. ("Penbrothers") is "a Philippine-based staffing agency." *Id.* ¶ 2.  Plaintiff alleges that "Silanna has secretly and systematically targeted and recruited [Plaintiff's] most experienced applications engineers and new product team leaders" and "used a third party (Penbrothers) to conceal the hiring of the Defendants to Silanna." *Id.* ¶ 18.  Silanna and Penbrothers were previously defendants in this action. *See generally* Doc. No. 12.  However, while this action was pending in the Northern District, Plaintiff voluntarily dismissed Silanna on July 10, 2019.  *See* Doc. No. 18.  The court dismissed Penbrothers based on lack of personal jurisdiction on November 18, 2019.  *See* Doc. No. 49.

**B. Defendant Mariano**

Plaintiff alleges that it employed Mariano "from approximately October 1, 2008 through January 26, 2018." SAC ¶ 28.  Mariano signed an employment agreement, which included an "Employee Agreement Regarding Confidentiality and Inventions" ("EARCI").  *Id.* ¶ 29; *see also* Doc. No. 78-2 (containing Mariano's employment agreement and EARCI).  Mariano was first employed as "a field applications engineer" in Plaintiff's "sales department based in the Philippines," but later joined APPS Philippines "and became the Team Leader for the LED Lighting Team." SAC ¶ 28.  Plaintiff alleges that "Mariano participated in the design and planning of applications of [Plaintiff's] new

and future high-voltage flyback controller ICs in power supplies" and "was exposed to and acquired [Plaintiff's] highly proprietary and sensitive information relating to the designs, product plans, and applications of these new and future high-voltage ICs." *Id.* ¶ 31.  Further, "Mariano was also intimately familiar with [Plaintiff's] Philippine operations." *Id.*  In accordance with Plaintiff's policy, "Mariano maintained a personal folder" on Plaintiff's secured drive. *See id.* ¶ 34.  However, Plaintiff alleges that "Mariano's folder surreptitiously disappeared from the APPS drive." *Id.*  Mariano subsequently left Plaintiff's employ and has since joined Silanna "as Principal Power Applications Engineer." *Id.* ¶ 36.  Plaintiff alleges that Mariano was employed "as a result of his intimate knowledge and possession of [Plaintiff's] proprietary and confidential information" and that he disclosed confidential information to Silanna. *Id.* ¶ 36; *see id.* ¶ 39.

## C. Defendant Barrameda

Plaintiff alleges that it employed Barrameda "from approximately April 7, 2015 to March 2, 2019" and that he "was a founding member of APPS Philippines." *Id.* ¶ 41. Barrameda's employment agreement with Plaintiff included an EARCI as well as a conflict of interest provision that required him to disclose any potential conflicts of interest to Plaintiff.  *See id.* ¶¶ 42, 44; *see also* Doc. No. 78-3 (containing Barrameda's employment agreement and EARCI).  Barrameda worked on both the "LED Lighting Team" and the "Low-Power Team" where he became a Team Leader in April 2018. SAC ¶ 41.  Plaintiff alleges that Barrameda's responsibilities included "participat[ion] in the design and planning of applications of [Plaintiff's] new and future high-voltage flyback controller ICs in AC-DC power supplies" and gave him access to Plaintiff's trade secrets "and other proprietary and confidential information." *Id.* ¶ 45.  Plaintiff further alleges, that unlike the other Defendants, Barrameda resigned from his position in Plaintiff's employ "purportedly to join Infineon Technologies." *Id.* ¶ 48.  However, Plaintiff asserts that Barrameda "never accepted any offer from Infineon" and "used the Infineon offer to lie about and conceal his employment with Silanna." *Id.* ¶ 50.

Plaintiff alleges, on information and belief, that "Barrameda gained employment with Silanna as a result of his access to and intimate knowledge and possession of [Plaintiff's] proprietary and confidential information." *Id.* ¶ 53.  Plaintiff further claims that Barrameda agreed to work for Silanna "months before he resigned from [Plaintiff]." *Id.* ¶ 54.  Finally, Plaintiff alleges, again on information and belief, that "Barrameda disclosed confidential and trade secret information about [Plaintiff's] products or projects" through the submission of his resume, his conduct during job interviews, and use of such information to assist Silanna in its product development while still employed by Plaintiff.  *Id.* ¶ 56.

**D. Defendant De Lara**

Plaintiff alleges that it employed De Lara "from approximately March 22, 2016 through May 11, 2019" first as "a senior engineer assigned to the LED Lighting Team" and ultimately as "Team Leader" following Mariano's departure.  *Id.* ¶ 58.  De Lara's employment agreement with Plaintiff included an EACRI.  *See id.* ¶ 59; *see also* Doc. No. 78-4 (containing De Lara's employment agreement and EARCI).  Like the other Defendants, De Lara "participated in the design and planning of applications of [Plaintiff's] new and future high-voltage flyback controller ICs in AC-DC power supplies."  SAC ¶ 61.  De Lara had access to Plaintiff's trade secrets "and other proprietary and confidential information" and "was also intimately familiar with [Plaintiff's] Philippine operations."  *Id.*

Plaintiff asserts that De Lara left its employ "ostensibly as the result of accepting employment with Penbrothers as a Staff Power Application Engineer" but "as De Lara knew, under an agreement between Silanna and Penbrothers, De Lara was hired by Penbrothers specifically for the purpose of being assigned to work for Silanna so that Silanna could hide its raiding of [Plaintiff's] top APPS Philippine engineers."  *Id.* ¶ 64.  To this effect, Plaintiff claims that De Lara was hired "as a result of his intimate knowledge and possession of [Plaintiff's] proprietary and confidential information."  *Id.* ¶ 65.  Finally, Plaintiff alleges that De Lara "provided Silanna with confidential business

5

and personnel information" and "also disclosed confidential and trade secret information about [Plaintiff's] products or projects" through his resume and during his interview. *Id.* ¶¶ 68, 69.

**E. Defendant Evangelista**

Plaintiff alleges that it employed Evangelista "from approximately September 19, 2017 through May 16, 2019" in the capacity of "design engineer assigned to the Low-Power Team." *Id.* ¶ 70. Evangelista's employment agreement with Plaintiff included an EARCI. *See id.* ¶ 71; *see also* Doc. No. 78-5 (containing Evangelista's employment agreement and EARCI). Similar to the other Defendants, Evangelista "participated in the design and planning of applications of [Plaintiff's] new and future high-voltage flyback controller ICs in AC-DC power supplies." *Id.* ¶ 73. He also had access to Plaintiff's trade secrets "and other proprietary and confidential information" and "was also intimately familiar with [Plaintiff's] Philippine operations." *Id.* Evangelista's role "included evaluations of new products at the applications/system level" and "he had access to all confidential documents and information about [Plaintiff's] products" that were stored on the secure drive. *Id.* ¶ 74. Plaintiff alleges that Evangelista was obligated to maintain a folder on the secured drive where he was to store "all his weekly reports, technical reports, and other status updates concerning the projects he was working on." *Id.* ¶ 76. Plaintiff notes however, that the folder in question "is completely empty" and alleges that "Evangelista either never saved any project-related reports and updates in his personal folder . . . or deleted them or had them deleted." *Id.*

Like De Lara, "Evangelista resigned from his employment with [Plaintiff] . . . ostensibly as the result of accepting employment with Penbrothers as a Senior Application Engineer." *Id.* ¶ 77. However, Plaintiff alleges that Evangelista was hired as part of a scheme between Silanna and Penbrothers through which Silanna attempted to conceal the fact that it was hiring Plaintiff's employees. *See id.* Plaintiff also claims, on information and belief, that Evangelista "formally became an employee of Silanna after the Penbrothers cover was blown." *Id.* Similar to the previous allegations, Plaintiff

asserts that Evangelista was employed primarily because of his knowledge of Plaintiff's "proprietary and confidential information" and that he provided such information to Silanna, including through the submission of his resume and during his job interview. *Id.* ¶¶ 78, 81–82.

## II. LEGAL STANDARD

A Rule 12(b)(6) motion to dismiss tests the sufficiency of the complaint. *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). A pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). However, plaintiffs must also plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see also* Fed. R. Civ. P. 12(b)(6). The plausibility standard demands more than a "formulaic recitation of the elements of a cause of action," or "'naked assertions' devoid of 'further factual enhancement.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555, 557). Instead, the complaint "must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011).

In reviewing a motion to dismiss under Rule 12(b)(6), courts must assume the truth of all factual allegations and must construe them in the light most favorable to the nonmoving party. *Cahill v. Liberty Mut. Ins. Co.*, 80 F.3d 336, 337–38 (9th Cir. 1996) (citing *Nat'l Wildlife Fed'n v. Espy*, 45 F.3d 1337, 1340 (9th Cir. 1995)). The court need not take legal conclusions as true merely because they are cast in the form of factual allegations. *Roberts v. Corrothers*, 812 F.2d 1173, 1177 (9th Cir. 1987) (quoting *W. Min. Council v. Watt*, 643 F.2d 618, 624 (9th Cir. 1981)). Similarly, "conclusory allegations of law and unwarranted inferences are not sufficient to defeat a motion to dismiss." *Pareto v. FDIC*, 139 F.3d 696, 699 (9th Cir. 1998).

In determining the propriety of a Rule 12(b)(6) dismissal, courts generally may not look beyond the complaint for additional facts. *See United States v. Ritchie*, 342 F.3d 903, 907–08 (9th Cir. 2003). "A court may, however, consider certain materials—

documents attached to the complaint, documents incorporated by reference in the complaint, or matters of judicial notice—without converting the motion to dismiss into a motion for summary judgment."  *Id.*; *see also Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001), *overruled on other grounds by Galbraith v. County Of Santa Clara*, 307 F.3d 1119, 1125–26 (9th Cir. 2002).  "However, [courts] are not required to accept as true conclusory allegations which are contradicted by documents referred to in the complaint." *Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293, 1295–96 (9th Cir. 1998) (citing *In re Stac Electronics Securities Litigation*, 89 F.3d 1399, 1403 (9th Cir. 1996)).

Where dismissal is appropriate, a court should grant leave to amend unless the plaintiff could not possibly cure the defects in the pleading. *Knappenberger v. City of Phoenix*, 566 F.3d 936, 942 (9th Cir. 2009) (quoting *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000)).

### III. <span style="text-transform:uppercase">Discussion</span>

Plaintiff asserts four causes of action in its SAC: breach of contract, trade secret misappropriation, interference with contractual relations, and unfair competition.  *See* SAC ¶¶ 99–150.  The Court will consider each claim in turn.

**A. Breach of Contract**

Plaintiff's first cause of action is breach of contract.  SAC ¶¶ 99–111.  Plaintiff sets forth two alleged breaches: (1) that Defendants breached the confidentiality and company materials clauses in their contracts and (2) that Defendant Barrameda breached the conflict of interest clause in his contract.  *See id.* ¶¶ 104–06, 108–10.

A breach of contract claim under California law requires "(1) the existence of a contract[,] (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) resulting damage to plaintiff."  *EPIS, Inc. v. Fidelity & Guaranty Life Ins. Co.*, 156 F. Supp. 2d 1116, 1124 (N.D. Cal. 2001) (citing *Reichert v. General Ins. Co.*, 442 P.2d 377, 381 (Cal. 1968)); *see also CDF Firefighters v. Maldonado*, 70 Cal. Rptr. 3d 667, 679 (Ct. App. 2008).

As a threshold matter, Plaintiff points out that Defendants only challenge the breach element.  *See* Doc. No. 81 at 10; *see also* Doc. No. 79-1 at 7–12 (failing to challenge any of the other elements).  The SAC alleges the existence of contracts between Plaintiff and each Defendant, and that Plaintiff performed its obligations under those contracts.  *See* SAC ¶¶ 29–31, 42–44, 59–60, 71–72, 107. Therefore, the Court will focus its analysis on the breach element and will consider each alleged breach in turn.

**1. Breach of the Confidentiality and Company Materials Clauses**

Plaintiff alleges that Defendants breached their confidentiality obligations.  *See* SAC ¶¶ 104–05, 108–09.  Defendants argue that Plaintiff's allegations regarding this breach do not "identify what information was copied or disclosed, by whom, to whom, or how that information fell under the contract definition of 'Proprietary Information.'" Doc. No. 79-1 at 8 (citing Doc. No. 78-2 at 4)); *see also* Doc. No. 82 at 4–8.  Defendants elaborate that "[n]othing in the SAC explains or describes in any way what information was copied or deleted, how that information was confidential, proprietary, or how its copying or deletion in any way constituted a breach of contract."  Doc. No. 79-1 at 9. Thus, Defendants argue that the "claim fails as a 'threadbare recital of the elements.'"  *Id.* at 8 (quoting *Iqbal*, 556 U.S. at 678).

Plaintiff responds that it has met its burden by alleging that Defendants "disclos[ed] to Silanna [Plaintiff's] confidential business and personnel information . . . to help Silanna target, solicit, and recruit [Plaintiff's] top engineering employees and Team Leaders."  *Id.* at 12 (citing SAC ¶¶ 21, 39, 57, 68, 81, 85, 89).  Plaintiff further asserts that it has alleged that Defendants breached the confidentiality clause "by disclosing to Silanna trade secret and other confidential information . . . at least in their resumes submitted to and job interviews with Silanna."  *Id.* (citing SAC ¶¶ 24, 40, 56, 69, 82, 108).  Finally, Plaintiff notes its contention that "Defendant Mariano made unauthorized copies of highly sensitive documents about [Plaintiff's] new and future products" and that "Defendants then inexplicably deleted or caused the deletion of Mariano's employee folder on [Plaintiff's] network."  *Id.* at 13 (citing SAC ¶¶ 22, 34,

35).  Plaintiff argues that these allegations satisfy the pleading requirement for the breach element.  *See id.* at 10.

The employment agreement contains the following pertinent clauses:

## VIII. <u>Confidentiality</u>

You acknowledge and recognize that the information, including, but not limited to the Company's trade secrets, technical data, marketing techniques, human resources, training materials, customer lists, location selection, pricing, client contracts, methods of doing business, and the like, and the similar information of its clients and its clients' customers, including, without limitation, credit card, calling card, address, telephone number or other personal information ("Confidential Information") are special, valuable and unique.  As a material inducement to the Company to enter into this contract and in consideration of the compensation the Company pays you under this contract, you agree:

a) That the Confidential Information is the sole and exclusive property of the Company (or a third party providing the information to the Company).  The Company (or the third party, if applicable) owns all worldwide rights to the information under patent, copyright, trade secret, confidential information or other property right.

b) That the Company's disclosure of Confidential Information to you does not confer upon you any license, interest or rights of any kind in or to the Confidential Information.  You may use the Confidential Information solely to benefit the Company and only during your employment.

c) To safeguard the Confidential Information against disclosure to others.

d) Not to directly or indirectly or in any manner, divulge, disclose or communicate the Confidential Information to others, without the express written permission of the Company, except that:

  i)   which you can demonstrate by written records was previously known;

ii)    which are now, or become in the future, public knowledge other than through your acts or omissions; and

iii)   which are lawfully obtained by you from sources independent of the Company.

e) Not to, directly or indirectly, in any form, by any means or for any purpose, reproduce, distribute, transmit, reverse engineer, de-compile, disassemble or transfer, or use, the Confidential Information, or any portion of either, to benefit yourself or any third party, or to cause any of the foregoing to happen.

f) Not to utilize schemes or formulas of the Company, or any variation or approximation thereof, for your own use or purposes, either by itself or in concert with others;

g) That you will return the Confidential Information that is in your possession or control to the Company, together with all copies, documents, records, notebooks, programs and similar items, collections and materials (in writing, electronic or otherwise) that relate to the Confidential Information, immediately (i) upon the Company's request, and/or (ii) upon the termination of your employment even without the Company's request.

h) That the obligations contained herein will remain in effect during and after your employment with the Company.

[. . .]

## XII.  Termination of Employment

[. . .]

You agree that all Company records and properties in your custody or control shall be immediately surrendered to the Company, if requested during your employment period, and at the termination thereof, whether or not requested.

*E.g.*, Doc. No. 78-3 at 5–6, 8 (Barrameda).  Mariano's employment agreement differs from the other Defendants' contracts; his does not contain the clauses reproduced above.

*See* Doc. No. 78-2.  However, all four Defendants signed the EARCI, which contains the following relevant clauses:

### 2. **Confidentiality**

I will maintain in confidence and will not disclose or use, either during or after the term of my employment without the prior express written consent of the Company, any proprietary or confidential information or know-how belonging to the Company ("Proprietary Information"), whether or not it is in written or permanent form, except to the extent required to perform duties on behalf of the Company in my capacity as an employee.  Proprietary information refers to any information, not generally known in the relevant trade or industry, which was obtain from the Company, or which was learned, discovered, developed, conceived, originated or prepared by me in the scope of my employment.  Such Proprietary Information includes, but is not limited to, software, technical and business information relating to the Company's inventions or products, research and development, production processes, manufacturing and engineering processes, machines and equipment, finances, customers, marketing and production and future business plans and any other information which is identified as confidential by the Company.  Upon termination of my employment or at the request of my supervisor before termination, I will deliver to the Company all written and tangible material in my possession incorporating the Proprietary Information or otherwise relating to the Company's business.  These obligations with respect to Proprietary Information extend to information belonging to customers and suppliers of the Company who may have disclosed such information to me as the result of my status as employee of the Company.

[. . .]

### 4. **Company Materials**

Upon termination of my employment with the Company or at any other time upon the Company's request, I will promptly deliver to the Company, without retaining any copies, all documents and other materials furnished to me by the Company or prepared by me for the Company.

*E.g.*, Doc. No. 78-3 at 16, 18 (Barrameda).  Nonetheless, Plaintiff asserts breach of confidentiality against all four Defendants in terms of the employment agreement.  *See*

12

SAC ¶¶ 104–05, 108–09.  Plaintiff does however tie its allegations regarding Mariano to the text of the EARCI.  *See id.* ¶ 30.

Plaintiff alleges that Defendants "disclosed to Silanna [Plaintiff's] confidential business and personnel information, including the performance and/or compensation structures of one or more [of] [Plaintiff's] applications engineers, to help Silanna target [Plaintiff's] top engineering employees and Team Leaders for solicitation and recruitment."  *Id.* ¶ 21; *see also id.* ¶ 108 (alleging that Defendants breached their employment agreements by making copies of or disclosing without permission Plaintiff's "proprietary and confidential information," such as business operation and product information).  Additionally, Plaintiff specifically claims that Defendants "disclosed trade secret information about [Plaintiff's] new and future high-voltage power conversion products in their resumes submitted to Silanna and/or during their job interviews with Silanna."  *See, e.g., id.* ¶ 24.

Defendants challenge this allegation in their reply and suggest that "[h]aving overemphasized the importance of the 'missing' resumes, Plaintiff fell on its sword once those resumes became court exhibits.  The 'smoking gun' evidence that Plaintiff promised would demonstrate a breach is simply not there, which forced Plaintiff to resort to a thin procedural argument."  Doc. No. 82 at 6.  Defendants have attached the resumes in question to their motion.  *See* Doc. Nos. 79-2, 79-3, 79-4, 79-5.  Regardless of what information may or may not be present in Defendants' resumes, the fact remains that Plaintiff has plausibly alleged that the disclosure occurred either in Defendants' resumes *or* during the course of their interviews with Silanna.  *See* SAC ¶ 24.  Because Plaintiff's allegation of disclosure during the interviews is sufficient, the Court finds that Plaintiff plausibly alleges breach of the confidentiality clause.

As to the alleged breach of the termination and company materials clauses, Plaintiff claims the following: "Defendant Mariano also made unauthorized copies of highly sensitive documents about [Plaintiff's] new and future products, including Operational Technical Specifications."  SAC ¶ 22.  Plaintiff elaborates that:

34.  While at Power Integrations, Mariano maintained a personal folder on the APPS drive as did all Power Integrations engineers.  These folders contained information about Power Integration products, and what the engineer was working on, and were the property of Power Integrations.  These folders were not to be taken or deleted upon termination.  In early 2019, Power Integrations discovered that Mariano's folder surreptitiously disappeared from the APPS drive.  On information and belief, Mariano and/or one or more other Defendants deleted or caused the deletion of Mariano's personal folder from the APPS drive around the time of or after Mariano's departure from Power Integrations.

*Id.* ¶ 34; *see also* ¶ 109.  The employment agreement and EARCI demonstrate that all four Defendants were bound to return any records or other company owned materials at the end of their employment with Plaintiff.  *E.g.*, Doc. No. 78-3 at 5–6, 8, 18 (Barrameda).  Plaintiff adequately alleges that one or more Defendants breached their obligation by deleting Mariano's personal information, which plausibly suggests a failure to deliver Plaintiff-related materials to Plaintiff at the end of employment.  Thus, the Court finds that Plaintiff plausibly alleges breach of the termination and company materials clauses to survive a motion to dismiss.

## 2. Breach of the Conflict of Interest Clause

Plaintiff also alleges that Defendant Barrameda breached his conflict of interest obligation.  *See* SAC ¶¶ 44, 51, 54, 110.  Defendants attack this assertion describing it as "an odd attempt to somehow save the obviously deficient claim for breach of contract" and as "yet another transparent attempt to find a roundabout way to enforce the non-compete provisions this Court has already ruled are invalid, unlawful, and unenforceable."  Doc. No. 79-1 at 11 (emphasis omitted).  Defendants argue that "[t]here is no fact in the SAC that supports the notion that Defendant Barrameda was performing work for Silanna during his employment with [Plaintiff]" and that "the only allegation of 'early' work for Silanna is an alleged conference Barrameda attended two weeks after he left [Plaintiff]."  *Id.* at 11–12 (citing SAC ¶ 24) (emphasis omitted); *see also* Doc. No. 82

at 7.  Plaintiff responds that "Barrameda's breach went even further" than the other Defendants because "after being secretly hired by Silanna and while still employed at [Plaintiff], Barrameda continued for months to assist Silanna with its AC-DC power conversion products using [Plaintiff's] confidential and trade secret information."  Doc. No. 81 at 13; *see id.* at 17.  Plaintiff claims this enabled Barrameda "to then promote and sell Silanna's very first flyback controller IC in the United States just two weeks after his official departure from [Plaintiff]."  *Id.* (citing SAC ¶¶ 23, 51, 56).

Barrameda's employment agreement contains the following relevant provision:

### X. Prohibition on Conflict of Interest

You warrant that to the best of your knowledge no conflict of interest exists or is likely to arise in the performance of your obligations under this Agreement.  In the course of this Agreement, you shall not render work or services for another employer, directly or indirectly, part-time or full-time while still employed by the Company.  Neither shall you engage in any activity likely to compromise your ability to perform your obligations under this Agreement fairly and independently.  In this regard, you shall immediately disclose to the Company any activity which constitutes or may constitute a conflict of interest.

Doc. No. 78-3 at 6 (Barrameda).  Further the EARCI contains the following relevant passage:

8.  **No Conflicting Obligations**
My performance of this Agreement and as an employee of the Company does not and will not breach any agreement to keep in confidence proprietary information, knowledge or data acquired by me prior to my employment with the Company.  I will not disclose to the company, or induce the Company to use, any confidential or proprietary information or material belonging to any previous employer or other person or entity.  I am not a party to any other agreement which will interfere with my full compliance with this Agreement.  I will not enter into any agreement, whether written or oral, in conflict with the provisions of this Agreement.

*Id.* at 18–19.  Plaintiff alleges that "Barrameda accepted an employment offer from Silanna and secretly started working for Silanna months before he resigned from [Plaintiff]."  SAC ¶ 23.  Plaintiff elaborates that "Barrameda was targeted, solicited, and recruited for Silanna . . . as early as October 2018 while Barrameda was still employed by [Plaintiff]" and that when Barrameda gave Plaintiff notice of his intention to work elsewhere, he "used Infineon as a decoy, lied about his intended employment with Infineon and hid his employment with Silanna while he was still employed by [Plaintiff]."  *Id.* ¶¶ 51, 54; *see id.* ¶¶ 23, 48.  Thus, Plaintiff claims that "Defendant Barrameda breached the conflict-of-interest provisions of the Barrameda employment agreement by failing to disclose to [Plaintiff] the actual conflict of interest after he accepted an employment offer from Silanna months before his resignation from [Plaintiff]."  *Id.* ¶ 110.  These allegations provide factual support for Plaintiff's conflict of interest breach claim.

The Court finds Defendants' argument that this claim is "an attempt to create a post-employment restraint on trade" unpersuasive.  *See* Doc. No. 79-1 at 12 (emphasis omitted).  Regardless of whether Barrameda's alleged attendance at a conference on behalf of Silanna shortly after his departure from Plaintiff's employ is persuasive, the fact remains that Plaintiff has alleged that Barrameda accepted an offer from Silanna during his tenure with Plaintiff without informing it, that this occurred "as early as October 2018," and that he misled Plaintiff as to where he would be working.  SAC ¶ 54; *see id.* ¶¶ 23, 48, 51, 110.  Thus, the Court finds that Plaintiff plausibly alleges breach of the conflict-of-interest clauses to survive a motion to dismiss.

### 3. Conclusion

Accordingly, the Court **DENIES** Defendants' motion to dismiss Plaintiff's breach of contract claim.

## B. Trade Secret Misappropriation

Plaintiff's second cause of action is trade secret misappropriation under 18 U.S.C. § 1836.  *See* SAC ¶¶ 112–137.  Defendants argue that this claim should be dismissed because Plaintiff "has not identified its trade secrets with any particularity, let alone sufficient particularity" and "has failed to establish how the technical aspects of its broad categories of alleged trade secret and confidential information are separate and distinct from information it openly provides to the general public."[3]  Doc. No. 79-1 at 13; *see also* Doc. No. 82 at 8–12.  In response, Plaintiff asserts that it "has met the Rule 8 pleading standard and put Defendants on ample notice of the trade secrets involved." Doc. No. 81 at 20.  Plaintiff also rejects Defendants' second argument and challenges the manner in which Defendants raised the issue.  *See id.* at 23.

As a threshold matter, there remains some confusion between the parties as to what pleading standard applies to this case.  Defendants remain convinced that Plaintiff must plead this claim with particularity.  *See* Doc. No. 79-1 at 13–15.  However, as Plaintiff correctly notes, this Court has already found that the "general pleading standards under Rule 8, which require plausibility as opposed to particularity," apply to this claim.  *See* Doc. No. 69 at 33; Doc. No. 81 at 20–21.  The Court's view of this issue has not changed, and as such, it will apply the plausibility standard set forth in Federal Rule of Civil Procedure 8 to this claim, rather than the particularity standard articulated in Federal Rule of Civil Procedure 9.  *See* Doc. No. 69 at 33 ("In applying the Rule 12(b)(6) standard to DTSA allegations, the Court applies general pleading standards under Rule 8, which require plausibility as opposed to particularity . . . ."); *see also Power Integrations, Inc. v. De Lara*, No. 20-cv-410-MMA (MSB), 2020 WL 1467406, at *17 (S.D. Cal. Mar. 26, 2020) (same).

---

[3] Defendants assert that Plaintiff has not demonstrated that the alleged trade secret is "separate and distinct from information it openly provides to the general public."  Doc. No. 79-1 at 13.  To support this argument, Defendants have attached extrinsic materials to their motion.  *See id.* at 16; Doc. No. 79-6. Even if the Court considered these materials, the Court finds Plaintiff's allegations sufficient to survive the instant motion to dismiss and that Defendants' argument and materials are better suited for a motion for summary judgment.

20-cv-410-MMA (DEB)

To plead a trade secret misappropriation cause of action under the Defend Trade Secrets Act ("DTSA"), a plaintiff must allege the following: "(1) the plaintiff owned a trade secret; (2) the defendant misappropriated the trade secret; and (3) the defendant's actions damaged the plaintiff." *AlterG, Inc. v. Boost Treadmills LLC*, 388 F. Supp. 3d 1133, 1144 (N.D. Cal. 2019) (quoting *Alta Devices, Inc. v. LG Elecs., Inc.*, 343 F. Supp. 3d 868, 877 (N.D. Cal. 2018)).  The DTSA creates a civil cause of action for owners of trade secrets that are misappropriated "if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce."  18 U.S.C. § 1836(b)(1). The DTSA defines "trade secret" as "all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing" so long as the owner (a) "has taken reasonable measures to keep such information secret" and (b) "derives independent economic value" from being secret.  18 U.S.C. § 1839(3).  The DTSA defines "misappropriation" as "(a) 'acquisition of a trade secret' by a person who knows or should know the secret was improperly acquired or (b) 'disclosure or use of a trade secret of another without express or implied consent.'"  *Cave Consulting Grp., Inc. v. Truven Health Analytics Inc.*, No. 15-CV-02177-SI, 2017 WL 1436044, at *3 (N.D. Cal. Apr. 24, 2017) (quoting 18 U.S.C. § 1839(5)).  In sum, the DTSA "contemplates three theories of liability: (1) acquisition, (2) disclosure, or (3) use."  *Id.* at *4 (citing 18 U.S.C. § 1839(5)).

### 1. Ownership of Trade Secret

Defendants argue that "the SAC is remarkably devoid of facts alleging a specific trade secret" and merely "contains a laundry list of items that fail to meaningfully define the trade secrets allegedly at issue."  Doc. 79-1 at 13; *see also* Doc. No. 82 at 8–10. Specifically, Defendants take issue with Plaintiff's use of the phrase "including but not limited to" in one of the complaint's paragraphs pertaining to the trade secret claim.  Doc.

79-1 at 14 (emphasis omitted) (citing SAC ¶ 31). Defendants argue that this language "shroud[s] the entire foundation of the SAC in a nebulous cloud of unidentified data, information or documents" and that "Defendants cannot defend themselves against open-ended, incomplete, unintelligible, and obscure definitions." *Id.* Plaintiff responds by distinguishing the SAC from the authority cited by Defendants in their motion and argues "the trade secrets identified in the SAC are tethered to a specific technology (*i.e.* new and future high-voltage flyback controller ICs) and to specific aspects of the technology (*i.e.* their designs, product plans, and applications)." Doc. No. 81 at 21–22 (citing SAC ¶¶ 31, 113). Further, Plaintiff argues that the "use of phrases such as 'including but not limited to' to give examples of the types of trade secrets at issue does not automatically render a trade secret claim impermissibly broad or vague." *Id.* at 22.

Given that the Court has established that Federal Rule of Civil Procedure 8 applies to this claim, *see* Doc. No. 69 at 33, the Court must determine whether Plaintiff's pleading of the DTSA claim plausibly expresses "a short and plain statement of the claim." Fed. R. Civ. P. 8(a)(2); *see also Twombly*, 550 U.S. at 570 ("[W]e do not require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face."). The Court finds that Plaintiff has met this requirement. The SAC includes the following relevant paragraph pertaining to trade secrets:

> 113. [Plaintiff] is a leading innovator in semiconductor technologies for high-voltage power conversion. As a leading innovator, [Plaintiff] owns special, valuable and unique trade secrets relating to the designs, product plans, and applications of its new and future high-voltage flyback controller ICs, including but not limited to Operational Technical Specifications ('OTS'), product designs, definitions, specifications, schedules and forecasts, new technologies (such as PowiGaN$^{TM}$, [Plaintiff's] gallium nitride technology, and active clamp technology used in these products), product meeting minutes, BOMs, business plans, business opportunities and strategies, marketing and sales projections, customer acquisition, customer requirements, preferences and feedback, and design challenges and solutions and negative know-how at the applications/system level.

SAC ¶ 113.  Further, the Complaint also states:

> 12.  Unlike many of its competitors, [Plaintiff] is an intellectual property ("IP") focused power technology company, having devoted a substantial amount of resources into developing the IP, including patents and trade secrets, for its high voltage power conversion products.  [Plaintiff's] technologies and IP are valuable information often sought after by its competitors.

> [. . .]

> 114.  New and future products are the crown jewels of any high-tech company and are the lifeblood of [Plaintiff].  [Plaintiff] has expended considerable amount of time, effort, and expense in developing and maintaining Power Integrations Future High-Voltage Power Product Trade Secrets, which are not known to the public and are not readily ascertainable by proper means to persons who could derive value from their disclosure or use, including [Plaintiff's] competitors.

> 115.  Each of Power Integrations Future High-Voltage Power Product Trade Secrets alleged herein derives independent economic value from not being generally known to, and not being readily ascertainable through proper means by [Plaintiff's] competitors and any other persons who can obtain economic value from the disclosure or use of the information.

*Id.* ¶¶ 112, 114–15 (citation omitted).  Finally, Plaintiff details the steps it has taken to ensure that its trade secrets remain confidential:

> including (1) keeping the trade secret information in [Plaintiff's] locked facilities and/or in secure and restricted-access computer network systems; (2) requiring non-disclosure agreements from employees and non-employees exposed to the trade secret information; (3) ensuring limited access to trade secret information; and (4) implementing additional procedures to require and remind employees to maintain the confidentiality of all such information.

*Id.* ¶ 116.  Plaintiff sufficiently alleges the requirements of a trade secret as defined by the DTSA, alleging that Plaintiff "has taken reasonable measures to keep such information secret" and that it "derives independent economic value" keeping its trade secrets confidential.  18 U.S.C. § 1839(3); *see* SAC ¶ 113, 112, 114–16.  Plaintiff's description of the trade secrets identifies the technologies at issue: "high-voltage flyback controller ICs" and "PowiGaN$^{TM}$, [Plaintiff's] gallium nitride technology, and active clamp technology used in these products."  SAC ¶ 113.  Further, Plaintiff has plausibly pleaded that it "derives independent economic value" from these trade secrets.  *See* § 1839(3); SAC ¶¶ 114–15.  Plaintiff further bolsters this claim of economic value by alleging that Silanna used Plaintiff's secret information to develop competing products in a relatively short period of time.  *See, e.g.*, SAC ¶¶ 20, 27, 130.  Collectively, these allegations plausibly support the "independent economic value" requirement of Section 1839(3).  Therefore, the Court finds that Plaintiff plausibly alleges the trade secret element of its DTSA claim under Rule 8 to survive a motion to dismiss.

### 2.  Misappropriation of Trade Secret

Defendants also challenge Plaintiff's pleading of misappropriation and argue that "it has alleged no facts sufficient to establish misappropriation."  Doc. No. 79-1 at 17; *see also* Doc. No. 82 at 10–12.  Defendants elaborate that "[n]owhere does the SAC plainly state how it is that the Defendants misappropriated [Plaintiff's] alleged 'trade secrets'" and that "the entirety of [Plaintiff's] allegations of misappropriation is its own unsupported belief that the Individual Defendants were 'exposed to' Power Integrations Future Product Trade Secrets and that this 'exposure' must have been the reason they were able to gain subsequent employment."  Doc. No. 79-1 at 17 (emphasis omitted).

Plaintiff responds that "[it] need not prove or 'establish misappropriation' at this juncture and has alleged more than sufficient facts to establish plausibility."  Doc. No. 81 at 24–25 (emphasis omitted).  Further, Plaintiff argues that its "claim does not rest on a 'mere possession' or 'inevitable disclosure' theory" and that it "has alleged circumstances that indicate both actual and threatened misappropriation of the trade

secrets by Defendants." *Id.* at 25.  In so doing, Plaintiff relies on language from this Court's previous Order: "[a]s the Court already found, Defendant Barrameda's 'alleged conduct of lying about his employment with Infineon Technologies constitutes circumstantial evidence that he is in possession of Plaintiff's sensitive information and a likeliness that he intends to use or disclose that information.'" *Id.* (quoting Doc. No. 69 at 37).[4]

The DTSA permits a court to enjoin "any actual or threatened misappropriation." 18 U.S.C. § 1836(b)(3)(A)(i).  Both state and federal courts in California have held that a plaintiff must prove more than a defendant's mere possession of trade secrets.  *E.g.*, *Pellerin v. Honeywell Int'l*, Inc., 877 F. Supp. 2d 983, 989 (S.D. Cal. 2012); *Cent. Valley Gen. Hosp. v. Smith*, 75 Cal. Rptr. 3d 771, 792 (Ct. App. 2008).  Threatened misappropriation may occur under several variations: (1) a defendant possesses trade secrets and "actually has misused or disclosed some of those trade secrets in the past"; (2) a defendant possesses trade secrets and "intends to improperly use or disclose some of those trade secrets"; and (3) a defendant possesses trade secrets and "wrongly refuses to return the trade secrets after a demand for their return has been made."  *Cent. Valley Gen. Hosp.*, 75 Cal. Rptr. 3d at 791–92.  However, "the issuance of an injunction based on a claim of threatened misappropriation *requires a greater showing than mere possession* by a defendant of trade secrets where the defendant acquired the trade secret by proper means."  *Id.* at 792 (emphasis added).

The SAC includes several allegations that constitute circumstantial evidence that Defendants both possessed sensitive information belonging to Plaintiff and a likeliness that they intended to use or disclose that information.  *See* Doc. No. 69 at 37 (citing

---

[4] In their Reply brief, Defendants take issue with the Court's finding that Barrameda's alleged lying "constitutes circumstantial evidence that he is in possession of Plaintiff's sensitive information and a likeliness that he intends to use or disclose that information."  *See* Doc. No. 82 at 11–12; Doc. No. 69 at 37.  Specifically, "Defendants ask the Court to reconsider this ruling."  Doc. No. 82 at 11.  The Court declines Defendants' invitation.

20-cv-410-MMA (DEB)

*Shippers, a Div. of Illinois Tool Works, Inc. v. Fontenot*, No. 13CV1349 JLS (MDD), 2013 WL 1209056, at *4 (S.D. Cal. Sept. 23, 2013)).  In addition to the allegations of Barrameda's duplicity with respect to his relationship with Infineon Technologies and Silanna, which the Court addressed in its previous order and have been reproduced in the SAC, *see id.*; *see e.g.*, SAC ¶¶ 48–49, 51–52, 124, Plaintiff has set forth allegations that are relevant to the issue of misappropriation.  For example, Plaintiff has elaborated on its allegations that Barrameda lied about his future employment with Infineon Technologies to include all Defendants:

> 128.  When [Plaintiff] demanded compliance with the Power Integrations Employment Agreements, counsel for Silanna and Defendants represented that [Plaintiff's] former employees, including Defendants, would be "assigned to [Silanna]'s 'DC-DC' power conversion business" which allegedly "is organized entirely separately from the Company's 'AC-DC' power products" that compete[] with [Plaintiff's] products.[]  As discovery in this case has shown, however, none of the Defendants were assigned to Silanna's DC-DC power conversion business; all Defendants work on Silanna's AC-DC power products either exclusively or primarily, and were doing so and/or assigned or expected to do so before their counsel's false representation to the court on May 17, 2019.  In fact, Defendants have been assigned to, and have worked on, the very flyback controller ICs with which Silanna competes with [Plaintiff].

SAC ¶ 128.  Further, expanding on the theory of circumstantial evidence, Plaintiff claims that "Defendants conspired with and knowingly allowed Silanna to use and exploit . . . their knowledge and possession of [Plaintiff's] proprietary and confidential information, including and especially Power Integrations Future High-Voltage Power Product Trade Secrets . . . to unfairly compete with [Plaintiff]." *Id.* ¶ 122.  Plaintiff adds other allegations, including that "Mariano made unauthorized copies of highly sensitive documents about [Plaintiff's] new and future products, including OTS" and that "Defendants also disclosed trade secret information about [Plaintiff's] new and future high-voltage power conversion products in their resumes submitted to Silanna and/or

20-cv-410-MMA (DEB)

during their job interviews with Silanna." *Id.* ¶¶ 123, 126.  Finally, Plaintiff alleges that Silanna has exploited its trade secrets "to introduce its first two high-voltage flyback controller ICs for AC-DC power supplies . . . just five to six months after hiring Defendant Mariano, and announce the full release of these products less than a year after hiring . . . Defendants Barrameda, Evangelista and De Lara." *Id.* ¶ 130.

The Court finds that Plaintiff's allegations, when considered together and in the light most favorable to Plaintiff, represent "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570; *see Cahill*, 80 F.3d at 337–38 (citing *Nat'l Wildlife Fed'n*, 45 F.3d at 1340); Doc. No. 69 at 37 (citation omitted).  Further, Plaintiff plausibly alleges the first two prongs described in *Central Valley General Hospital*.  *See* 75 Cal. Rptr. 3d at 791–92.  Therefore, the Court finds that Plaintiff has sufficiently pleaded the misappropriation element of its DTSA claim to survive a motion to dismiss.

**3. Damages**

Defendants do not appear to address the damages element of the DTSA claim. Plaintiff does not provide argument on this element either, though it notes that "Defendants do not dispute the sufficiency of pleading as to the damages element."  Doc. No. 81 at 19.  Plaintiff's complaint includes the following relevant passages:

> 131.  On information and belief, Defendants have used [Plaintiff's] trade secrets of substantial and economic value for their own personal gain, allowing Silanna to unfairly compete with [Plaintiff] in the market for high-voltage flyback controller ICs for AC-DC power supplies.

> 132.  Defendants' current and continued misappropriation of [Plaintiff's] trade secrets is reckless and malicious.  Defendants knew of and agreed to abide by the confidentiality obligations and restrictions on the use and disclosure of [Plaintiff's] trade secrets.

> 133.  As a direct and proximate result of Defendants' current and continued misappropriation of [Plaintiff's] trade secrets, [Plaintiff] will suffer imminent and irreparable harm.

134.  Unless enjoined by this Court, Defendants' acts of misappropriation will continue, and [Plaintiff] will continue to suffer irreparable harm.

135.  [Plaintiff] has no adequate remedy at law and is entitled to an injunction under 18 U.S.C. § 1836(b)(3)(A).

136.  On information and belief, Defendants' continued use of these trade secrets is willful and malicious, and [Plaintiff] is entitled to recover enhanced damages and its reasonable attorneys' fees under 18 U.S.C. §§ 1836(b)(3).

Doc No. 78 ¶¶ 131–36.  Therefore, the Court finds that Plaintiff has sufficiently pleaded the damages element of its DTSA claim.

**4. Conclusion**

The Court finds that Plaintiff has alleged sufficient facts to plead its DTSA claim.  Accordingly, the Court **DENIES** Defendants' motion to dismiss Plaintiff's DTSA claim.

**C. Interference with Contractual Relations**

Plaintiff's third cause of action is interference with contractual relations.  *See* SAC ¶¶ 138–44.  Defendants challenge this claim on two grounds.  *See* Doc. No. 79-1 at 19–20.  First, Defendants argue that Plaintiff has failed to allege breach of contract and that "[b]ecause . . . the breach of contract claims lack facts alleging an actual breach, the claim for interference likewise falls."  *Id.* at 20.  Second, Defendants argue that "[t]he claim further fails under 12(b)(6) for lack of specificity."  *Id.*  Defendants elaborate that "[i]nsofar as the claim is based solely on alleged interference with the Defendants' contracts, it is 1) simply another attempt to restate the already-dismissed claim for violation of non-solicitation covenants, and 2) lacking any factual specifics with respect to who induced what breach of what contract or covenant."  *Id.*; *see also* Doc. No. 82 at 12–13.  Plaintiff responds that it "has sufficiently pled each element" of the claim.  *See* Doc. No. 81 at 29.  Specifically, Plaintiff argues that it "alleges that each Defendant knowingly interfered with [Plaintiff's] contractual relations with at least other Defendants

by conspiring with Silanna and each []other" and by "using [Plaintiff's] confidential

personnel information, to secretly target and entice [Plaintiff's] top-performing

applications engineers to improperly use and disclose [Plaintiff's] confidential and trade

secret information in breach of their employment agreements, causing harm to

[Plaintiff]." *Id.* (citing SAC ¶¶ 39, 54, 57, 66, 68, 79, 81, 89, 138–43).

> The elements which a plaintiff must plead to state the cause of action for intentional interference with contractual relations are (1) a valid contract between plaintiff and a third party; (2) defendant's knowledge of this contract; (3) defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage.

*AlterG, Inc.*, 388 F. Supp. 3d at 1149 (quoting *Pac. Gas & Elec. Co. v. Bear Stearns &*

*Co.*, 791 P.2d 587, 589–90 (Cal. 1990)).  "Unlike the related tort of intentional

interference with prospective economic advantage . . . intentional interference with

contractual relations does not require that a defendant's conduct be independently

wrongful." *Blizzard Entm't Inc. v. Ceiling Fan Software LLC*, 28 F. Supp. 3d 1006, 1015

(C.D. Cal. 2013) (citing *Quelimane Co. v. Stewart Title Guar. Co.*, 960 P.2d 513, 530

(1998)).

The Court has already found that Plaintiff has adequately pleaded its claims for

breach of contract.  *See supra* Section III.A.  Thus, Plaintiff has alleged the first and

fourth elements of its interference claim.

The Court finds Plaintiff sufficiently pleads second element—defendants'

knowledge of the contract—because Plaintiff alleges that such knowledge existed "at

least because they each executed their respective employment agreements with

[Plaintiff]." *See id.*; SAC ¶ 140.  The combination of this allegation with the specific

allegations that each Defendant signed substantially similar employment contracts with

Plaintiff and the fact that these agreements are attached to the Complaint as exhibits

1    satisfies this element. *See, e.g.*, SAC ¶¶ 29–31, 42–44, 59–60, 71–72; Doc. No. 78-3

2    (Barrameda).

3         The third element—defendants' intentional acts designed to induce a breach or

4    disruption of the contractual relationship—is more problematic.  In the section of the

5    SAC that covers this cause of action, Plaintiff asserts that "Defendants have interfered

6    with and continue to interfere with [Plaintiff's] contracts to put [Plaintiff] in a

7    competitive disadvantage and prevent performance of those contracts and/or to cause the

8    termination and/or breach of these contracts."  SAC ¶ 142.  By itself this "threadbare

9    recital[] of the elements" is insufficient.  *Iqbal*, 556 U.S. at 678.  The SAC does not

10   specify how each Defendant intentionally interfered with the contractual relations

11   between Plaintiff and other Defendants or employees.  For example, Plaintiff highlights

12   several paragraphs alleging that Defendants "provided Silanna with confidential business

13   and personnel information . . . to target [Plaintiff's] top engineering employees . . . for

14   solicitation and recruitment."  SAC ¶ 39; *see also* SAC ¶¶ 57, 68, 81.  Plaintiff also

15   alleges that "conspiring with Silanna and each other, Defendants also used [Plaintiff's]

16   confidential business operations and personnel information to help Silanna target, solicit,

17   and recruit [Plaintiff's] engineers . . . causing a group of Philippine-based top engineers

18   to resign from [Plaintiff] and join Silanna."  *Id.* ¶ 89.

19        While these allegations support the claim that Defendants breached their contracts

20   with Plaintiff, they do not allege that Defendants intentionally interfered with the

21   contracts of other employees.  First, as currently pleaded, these allegations imply that it

22   was Silanna, rather than Defendants, that was using the information allegedly provided

23   by Defendants to "target" Plaintiff's employees.  *See id*.  However, Silanna is not a party

24   to this action.  *See* Doc. No. 18.  Second, allegations that some of Plaintiff's other

25   employees were "targeted" by Silanna, and subsequently left Plaintiff's employ do not

26   expressly indicate that these employees breached their contracts.  *See* SAC ¶¶ 39, 57, 68,

27   81, 89.  Thus, these allegations are insufficient to establish that Defendants intentionally

28   interfered with contractual relations between Plaintiff and its other employees.

However, Plaintiff sets forth additional allegations with respect to Defendant Mariano. *See id.* ¶¶ 54, 66, 79. For example, Plaintiff alleges that "[o]n information and belief, Barrameda was targeted, solicited, and recruited for Silanna by Mariano, as early as October 2018 while Barrameda was still employed by [Plaintiff]." *Id.* ¶ 54; *see also id.* ¶¶ 66, 79. As previously noted by the Court, Plaintiff alleges that Barrameda breached his conflict of interest clause by working for both Plaintiff and Silanna at the same time. *See, e.g.*, *id.* ¶ 54. While this sufficiently alleges that Barrameda breached his contract, the language describing Mariano's actions only mentions that he "targeted, solicited, and recruited [Barrameda] for Silanna." *See id.* Plaintiff does not allege that Mariano solicited or recruited Barrameda to work for Silanna and Plaintiff simultaneously or otherwise induce Barrameda to breach his contract.

Plaintiff also alleges that De Lara and Evangelista were also "targeted, solicited, and recruited for Silanna by Mariano and Hodge." *See id.* ¶¶ 66, 79. Like Silanna, Hodge has also been voluntarily dismissed from this suit by Plaintiff. *See* Doc. No. 32. Further, as noted above, these allegations do not allege that Mariano intentionally tried to induce De Lara and Evangelista to breach their contracts by allegedly soliciting or recruiting them to change employers. *See* SAC ¶¶ 66, 79.

Thus, the Court finds that Plaintiff has not sufficiently pleaded its interference with contractual relations claim. Accordingly, the Court **GRANTS** Defendants' motion and **DISMISSES** Plaintiff's interference with contractual relations claim with leave to amend.

## D. Unfair Competition

Plaintiff's fourth cause of action is unfair competition under the California Business and Professions Code. *See* SAC ¶¶ 145–50. Defendants argue that "[b]ecause the SAC still alleges no facts sufficient to establish any wrongful, unlawful, or fraudulent activity, there is no factual predicate for a claim under section 17200." Doc. No. 79-1 at 20–21 (citation omitted); *see also* Doc. No. 82 at 13. Plaintiff responds that "[b]ecause

[Plaintiff] has adequately alleged at least Defendants' violation of the DTSA, Defendants' motion to dismiss the UCL claim must be denied." Doc. No. 81 at 29.

California Business & Professions Code § 17200 "establishes three varieties of unfair competition—acts or practices which are unlawful, or unfair, or fraudulent." *Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 973 P.2d 527, 540 (1999) (citations omitted). "Because the statute is written in the disjunctive, it is violated where a defendant's act or practice violates any of the foregoing prongs." *Davis v. HSBC Bank Nevada, N.A.*, 691 F.3d 1152, 1168 (9th Cir. 2012).

The unlawful prong "is essentially an incorporation-by-reference provision." *Obesity Research Inst., LLC v. Fiber Research Int'l, LLC*, 165 F. Supp. 3d 937, 952 (S.D. Cal. 2016); *see also Cel-Tech Commc'ns, Inc.*, 973 P.2d at 539–49 ("By proscribing 'any unlawful' business practice, 'section 17200 "borrows" violations of other laws and treats them as unlawful practices' that the unfair competition law makes independently actionable."). Accordingly, "[w]hen a statutory claim fails, a derivative UCL claim also fails." *Obesity Research Inst.*, LLC, 165 F. Supp. 3d at 953 (quoting *Aleksick v. 7–Eleven, Inc.*, 140 Cal. Rptr. 3d 796, 801 (Ct. App. 2012)). Here, Plaintiff can succeed on this prong only if it pleads sufficient facts to support another cause of action. *See Aleksick*, 140 Cal. Rptr. 3d at 801. Because Plaintiff sufficiently pleads its DTSA claim, *see supra* Section III.B, the Court finds that Plaintiff sufficiently pleads its unlawful prong UCL claim.

Accordingly, the Court **DENIES** Defendants' motion to dismiss Plaintiff's unfair competition claim.

### IV. CONCLUSION

For the foregoing reasons, the Court **GRANTS in part and DENIES in part** Defendants' motion to dismiss. Although Plaintiff has failed to adequately plead it claim for interference with contractual relations, it is not clear that it would be unable to do so if given leave to amend. Accordingly, that claim is dismissed without prejudice and with

leave to amend.  *See Knappenberger*, 566 F.3d at 942.  Plaintiff may file an amended complaint curing the deficiencies noted herein on or before **August 24, 2020**.

      **IT IS SO ORDERED**.

Dated: August 10, 2020

                                        HON. MICHAEL M. ANELLO
                                        United States District Judge